# EXHIBIT B

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
USAA CASUALTY INSURANCE COMPANY; and DOES 1-100, inclusive

**ENDORSED
FILED
ALAMEDA COUNTY**

RECEIVED

JUN 18 '07

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CAREY T. CALDWELL

**MAY 2 2 2007**

CLERK OF THE SUPERIOR COURT
By Esther Coleman, Deputy

WESTPRO LEGAL

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):*<br><br>ALAMEDA COUNTY SUPERIOR COURT<br>1225 Fallon Street<br>Oakland, California 94612<br>Northern District | CASE NUMBER: *(Número del Caso):* **WG07327137** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
MICHAEL J. BIDART, #60582          (909) 621-4935
SHERNOFF, BIDART & DARRAS
600 S. Indian Hill Boulevard
Claremont, CA 91711          *Esther Coleman*

DATE:          PAT S. SWEETEN          Clerk, by _____, Deputy
*(Fecha)* **MAY 2 2 2007**          *(Secretario)*          *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citation use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): USAA Casualty Insurance Company
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)          ☐ CCP 416.90 (authorized person)
          ☒ other (specify): Business Form Unknown
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

American LegalNet, Inc.
www.USCourtForms.com


1  MICHAEL J. BIDART #60582
   RICARDO ECHEVERRIA #166049
2  **SHERNOFF BIDART & DARRAS, LLP**
3  600 South Indian Hill Boulevard
   Claremont, CA 91711
4  Telephone:    (909) 621-4935
   Facsimile:    (909) 625-6915
5
6  Attorneys for Plaintiffs

**ENDORSED
FILED**
ALAMEDA COUNTY

MAY 22 2007

CLERK OF THE SUPERIOR COURT
By Esther Coleman, Deputy

7

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **COUNTY OF ALAMEDA, NORTHERN DISTRICT**

10

11  CAREY T. CALDWELL

12            Plaintiff,

13     vs.

14  USAA CASUALTY INSURANCE
15  COMPANY; and DOES 1-100, inclusive

16            Defendants.

17

Case No.: **WG07327137**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING; and

2. BREACH OF CONTRACT

18

19       Plaintiff alleges based on her own knowledge with respect to her own acts and

20  on information and belief with respect to all other matters:

21                              **I.**

22                        **INTRODUCTION**

23       This case is an outrageous example of USAA's callous treatment of its own

24  insured in the handling of an underinsured motorist claim.

25       1.    Carey Caldwell, ("Ms. Caldwell") is a 52-year-old woman, who had been

26  employed as a curator for the Oakland Museum for over 18 years, and was involved in

27  an automobile collision on June 6, 2003 ("subject collision") in which she was violently

28  struck by an SUV driven by Gwendolyn Harrison ("Ms. Harrison"), also a USAA insured.

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 9711  TEL 909 621 4935

1  As a result of the injuries sustained, Ms. Caldwell filed a personal injury lawsuit against

2  Ms. Harris in the Alameda County Superior Court.

3      2.      On March 19, 2003, three months before the subject collision, Ms.

4  Caldwell underwent a revision surgery for a 1988 left hip replacement. She had

5  returned to work, was doing very well and was expected to make a full recovery until the

6  subject collision, when a SUV, driven by Gwendolyn Harrison ran a stop light and

7  violently slammed into the driver's side door of her vehicle, crushing that door inward

8  directly into the left side of Ms. Caldwell's body. Ms. Caldwell eventually was diagnosed

9  with a fractured femur which required reconstructive surgery, and misalignment of the

10  prosthesis in her left leg. She sustained over $110,000 in medical bills and over

11  $53,000 in wage loss.

12      3.      On December 31, 2003, Ms. Caldwell settled with driver Ms. Harrison for

13  her $100,000 policy limits with USAA. At the time of the subject collision, Ms. Caldwell

14  had Underinsured Motorist (UIM) coverage, also with USAA, with policy limits of

15  $300,000. A copy of Ms. Caldwell's USAA Policy is attached as Exhibit "1".

16      4.      On February 19, 2004, Ms. Caldwell submitted an offer to USAA to settle

17  her UIM claim for the remaining $300,000 policy limits less a $100,000 offset for the

18  settlement of the earlier claim against Ms. Harrison. USAA refused to offer any UIM

19  benefits whatsoever, and engaged in a multitude of bad faith tactics which included

20  many protracted delays, including an arbitration that was not completed until nearly two

21  years later. After numerous delays in investigating Ms. Caldwell's claim, USAA finally

22  offered $50,000 new money shortly before arbitration, however, Ms. Caldwell did not

23  accept that offer and proceeded to arbitration which resulted in Ms. Caldwell obtaining

24  an award of $355,110.97. This award exceeded the June 4, 2004 CCP §998 Offer to

25  Compromise of $199,745, served by Ms. Caldwell.

26      5.      As a further example of USAA's bad faith actions, USAA's defense

27  counsel explicitly stated in a January 18, 2006 letter that USAA would pay reasonable

28  costs and $57,596.08 in interest. USAA then reneged on its commitment and alleged

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

COMPLAINT AND DEMAND FOR JURY TRIAL

1    that the CCP §998 was invalid because it was made before arbitration was formally

2    demanded. Following the arbitration award, Ms. Caldwell filed and served a

3    Memorandum of Costs, and USAA filed a Motion to Strike the Memorandum of Costs.

4    USAA's Motion was denied, and defense counsel stated that USAA was considering an

5    appeal. Claimant then offered to settle the CCP §998 for the costs of $17,516.59 and

6    half of the $57,596.08 in statutory interest pursuant to Civil Code §3291. In response,

7    counsel for USAA indicated that they wanted to negotiate a global settlement of all

8    potential claims.

9         6.    Ms. Caldwell hired counsel, Joseph E. Tomasik (hereinafter "Mr.

10   Tomasik"), to represent her. As a result, Ms. Caldwell sustained significant economic

11   damages as a result of USAA's bad faith conduct, including litigation costs of

12   $17,516.59, interest of $57,596.08, and attorneys' fees of $97,412.25. Moreover, Ms.

13   Caldwell also sustained additional and substantial non-economic damages. She has

14   had numerous serious health problems throughout the last twenty years, including brain

15   surgery for removal of a brain tumor in 1998, and thus was in a very vulnerable physical

16   and emotional state. The money from the underlying settlement was used to pay past

17   debt, and Ms. Caldwell only worked about half-time from the time of the collision

18   through March, 2006. Thus, Ms. Caldwell was obviously experiencing extreme financial

19   hardship, and USAA's bad faith conduct caused her a great amount of anxiety and

20   emotional distress.

21                                    II

22                              **THE PARTIES**

23        7.    Plaintiff, Carey Caldwell, ("Ms. Caldwell") is, and at all relevant times was,

24   a resident of the city of Alameda, in the State of California.

25        8.    Defendant USAA Casualty Insurance Company ("USAA"), a member of

26   the USAA Group, was and is a company domiciled in the State of Texas, conducting the

27   business of insurance in the County of Alameda, State of California.

28        9.    Plaintiff does not know the true names and capacities of Defendants sued

COMPLAINT AND DEMAND FOR JURY TRIAL



1   herein as Does 1-100, inclusive, and therefore sues said Defendants by such fictitious

2   names pursuant to California Code of Civil Procedure §474.  Plaintiff will amend this

3   Complaint to state the true names and capacities of the fictitiously named Defendants

4   when the same are ascertained.  Plaintiff is informed and believes and based thereon

5   alleges that each of the fictitiously named Defendants is legally responsible in some

6   manner for the events and damages alleged in this Complaint under the causes of

7   action stated herein.

8        10.    Plaintiff is informed and believes and based thereon alleges that at all

9   times mentioned herein, each of the Defendants was the agent, partner, joint venturer,

10  associate, or employee of one or more of the other Defendants and was acting in the

11  course and scope of such agency, partnership, joint venture, association, or

12  employment when the acts giving rise to the cause of action occurred.  The true names

13  or capacities, whether individual, corporate, associate, or otherwise, of Defendants

14  DOES 1 through 100, inclusive, are unknown to Plaintiff, who therefore sues said

15  Defendants by such fictitious names.  Plaintiff is informed and believes and thereon

16  alleges that each of the Defendants sued herein as a DOE is legally responsible in

17  some manner for the events and happenings referred to herein.  Plaintiff will ask leave

18  of this court to amend this compliant to insert their true names and capacities in place

19  and instead of the fictitious names when the same become known.

20       11.    Unless otherwise alleged, at all relevant times, Defendants, and each of

21  them, were the agents and employees of USAA, and were at all times acting within the

22  purpose and scope of said agency and employment, and USAA has ratified and

23  approved the acts of its agents.

24                                    III

25                                  FACTS

26  A.   Factual Background

27       12.    Prior to the subject collision, Ms. Caldwell had undergone a total

28  replacement of her left hip in 1988.  On March 19, 2003, she had a revision of the left

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935



1   hip replacement by Dr. David Schurman at Stanford Hospital in Palo Alto, California.

2   Dr. Schurman concluded, in post-surgery examinations, that Ms. Caldwell was doing

3   very well, and he anticipated that she would make a full recovery from her hip revision

4   surgery.  While she had very little symptomology from her previous surgery at the time

5   of the collision, Ms. Caldwell obviously was extremely vulnerable to trauma, and thus

6   was a quintessential eggshell plaintiff at the time of the collision.  Ms. Caldwell's medical

7   records from the day of the collision until her femur surgery two months later

8   demonstrate a continuous and progressively worsening pattern of pain and disability on

9   the lower left side of her body.  There was overwhelming evidence that the subject

10  collision was a substantial factor in causing the fracture and surgery.  USAA was aware

11  of this issue in reviewing Ms. Caldwell's medical records and taking her deposition in

12  the third party case.  USAA obviously concluded in the third party case that the collision

13  was a substantial factor in necessitating the surgery, as USAA paid the $100,000 policy

14  limits on behalf of Ms. Harrison.

**B.      Defense Contentions**

16           13.     USAA retained Terrence McDonnell, M.D. to perform the defense medical

17  exam ("DME") of Ms. Caldwell on July 12, 2005.   Mr. Tomasik, on behalf of Ms.

18  Caldwell, requested in writing that USAA comply with the duty of good faith and fair

19  dealing by selecting neutral experts, but USAA completely ignored this request and its

20  duty by retaining Dr. McDonnell, an orthopedic surgeon who has conducted many

21  defense medical exams for insurance companies over many years, and testifies

22  predominantly for defense.  In his DME report dated July 11, 2005 (curiously one day

23  *before* the exam), Dr. McDonnell states on page 9 "There are x-rays of the hip from

24  Alameda Hospital dated June 6, 2003. ... There is also an arrow indicating a possible

25  pubic ramus fracture."  On page 29, Dr. McDonnell states "The changing of rotation in

26  the femoral component with rotation is somewhat unusual.  However, the records by Dr.

27  Schurman indicate that she had decent orientation of rotation prior to the motor vehicle

28  accident."  A true and correct copy of Dr. McDonnell's DME Report is attached hereto

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

1    as Exhibit "2".

2        14.    On page 30, Dr. McDonnell states "In summary, I think that this woman

3    **did sustain a rotation of the femoral component from the motor vehicle accident**

4    **in question. It has altered her gait** somewhat but not excessively. The **limp** that she

5    has in [sic] associated with a longstanding hip problem with multiple operations that

6    have left her hip weakened." (Emphasis added.) On page 31, Dr. McDonnell states

7    "The striking part of the examination was really the internal rotational differences in the

8    total hip replacement as noted. ...Regarding the medical treatment from the motor

9    vehicle accident in question, I think her **treatment seemed to be appropriate for the**

10    **hip.** The patient certainly could live with the amount of **internal rotation deformity** she

11    has of the hip following the motor vehicle accident." (Emphasis added.)

12    **C.    USAA's Claims Handling**

13        15.    The initial handling of this claim by the UIM adjuster from USAA was rife

14    with unnecessary delays and acts of bad faith. Following settlement of the underlying

15    claim, on February 19, 2004 Mr. Tomasik sent a detailed settlement demand package,

16    including a six-page letter and all relevant medical records and bills, and requested that

17    USAA pay the policy limits less any amounts of applicable offsets. A true and correct

18    copy of Mr. Tomasik's February 19, 2004 letter is attached hereto as Exhibit "3". Shortly

19    thereafter, Mr. Tomasik submitted wage loss documentation to USAA by sending a copy

20    of Ms. Caldwell's paycheck stub on February 23, 2004.

21        16.    On February 26, 2004, USAA adjuster Ray Umamoto responded that

22    USAA was "unable to accept or reject your demand for policy limits. The evidence you

23    have sent us to date raises the question how your client's left hip problem was caused

24    or aggravated by this accident." and stated that "Your claim has not been concluded

25    because we will required [sic] your client's complete medical records and all films in

26    respect to her left hip problems." That letter also stated "Please send me proof of loss

27    of earnings, employment history pre-accident to present." A true and correct copy of

28    Mr. Umamoto's February 26, 2004 letter is attached hereto as Exhibit "4".

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT CA 91711 TEL 909 621 4935

- 6 -

17.    On March 19, 2004, Mr. Tomasik responded that he had already provided all medical records in his possession as well as wage loss documentation, and that USAA should subpoena any other records or films that they needed.  A true and correct copy of Mr. Tomasik's March 19, 2004 letter is attached hereto as Exhibit "5".

18.    Mr. Umamoto's response dated March 23, 2004 states "Your claim has not been concluded because we are in the process of reviewing what we have in our file to date on this very complex injury claim being made by your client."  No mention was made of any need or attempts by USAA to obtain additional documentation.  A true and correct copy of Mr. Umamoto's March 23, 2004 letter is attached hereto as Exhibit "6".

19.    On April 13, 2004, Mr. Tomasik responded to Mr. Umamoto explaining that the February 19, 2004 letter included all the medical records and bills and that USAA had nearly 2 months to review the claim.  Mr. Tomasik explained that regardless of whether the femur fracture was sustained in the subject collision or due to a fall caused by pain from the collision, it was clear that the collision was a substantial factor in causing the fracture.  A true and correct copy of Mr. Tomasik's April 13, 2004 letter is attached hereto as Exhibit "7".

20.    On April 16, 2004, nearly 2 months after Mr. Tomasik submitted his settlement package to USAA, Mr. Umamoto responded by letter stating that "This claim has not been concluded because we will need to get all pre-post [sic] accident medical records and films for your client.  We will need to proceed with a formal records review to further understand what injury was caused or aggravated by this accident.  I have ordered all left hip films from Dr. Schurman, Stanford Hospital (Palo Alto) Stanford University Medical Center (San Francisco), Alta Bates Medical Center (Oakland) Dr. Mitra."  A true and correct copy of Mr. Umamoto's April 16, 2004 letter is attached hereto as Exhibit "8".

21.    On April 19, 2004, Mr. Tomasik spoke with Mr. Umamoto by telephone, and followed up with an April 22, 2004 letter expressing his "surprise and dis-appointment that USAA first ordered the X-ray films just a few days ago, especially

COMPLAINT AND DEMAND FOR JURY TRIAL

1  since we made our settlement demand over two months ago, and you had a Medical

2  Authorization signed by Ms. Caldwell last year. ...   In addition, if USAA does proceed

3  with a formal records review, we believe that the duty of good faith and fair dealing

4  requires that it select a fair and impartial doctor to perform that review, as opposed to

5  one of the biased 'hired guns' that some insurance carriers use in third party cases."

6  Mr. Tomasik also pointed out that USAA still had not obtained post-collision films even

7  though Mr. Umamoto had claimed in a previous telephone conversation that he had

8  obtained all of Ms. Caldwell's films.  A true and correct copy of Mr. Tomasik's April 22,

9  2004 letter is attached hereto as Exhibit "9".

10      22.    On April 26, 2004, Mr. Tomasik faxed a letter to Mr. Umamoto advising "I

11  have had Ms. Caldwell's X-rays reviewed by a consulting expert radiologist.  He stated

12  that in viewing the Alameda Hospital Emergency Room X-rays from the date of the

13  collision, Ms. Caldwell also suffered a displaced left hip fracture (which was apparently

14  missed until now) as a result of the collision."  That letter also reasoned "Even if USAA

15  somehow could prove that the femur fracture was sustained in a fall, it is clear from all

16  of the medical records that you already possess that the collision was a substantial

17  factor (and probably the dominant factor) in Ms. Caldwell's pain and weakness that

18  caused her leg to give out.  California law does not provide for apportionment of this

19  claim, since there is no involvement of any independent tortfeasor other than the

20  underinsured motorist, Gwendolyn Harrison.  Thus, this is clearly a policy limits case no

21  matter what any further investigation reveals."  A true and correct copy of Mr. Tomasik's

22  April 26, 2004 letter is attached hereto as Exhibit "10".

23      23.    On April 28, 2004 Mr. Umamoto responded with a letter again stating that

24  "We are unable to accept or reject your demand for the Underinsured Motorist policy

25  limits at this time."  Mr. Umamoto also requested a copy of Ms. Caldwell's expert

26  radiologist report.  However, as Mr. Tomasik had previously advised Mr. Umamoto, the

27  X-rays were reviewed by a "consulting expert radiologist", therefore, there was no

28  written report since that doctor was merely consulting.  A true and correct copy of Mr.

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711  TEL 909 621 4935

1    Umamoto's April 28, 2004 letter is attached hereto as Exhibit "11".

2        24.    Mr. Tomasik responded by letter on May 4, 2004 noting that in his last two

3    letters he had requested that Mr. Umamoto inform him of what offsets or reductions that

4    USAA was claiming, but Mr. Umamoto had ignored these repeated requests.  That letter

5    also stated "I have repeatedly requested a factual and legal explanation as to how

6    USAA's further investigation will have any relevance to the value of Ms. Caldwell's

7    claim, but you still have yet to provide that information to me."  Mr. Tomasik also noted

8    "The important point here is that within two weeks my office was able to request and

9    obtain copies of all of Ms. Caldwell's X-rays as well as an opinion from an expert

10    radiologist, but USAA has not been able to do the same within three months, even

11    though they owe a duty of good faith and fair dealing to perform a prompt investigation."

12    A true and correct copy of Mr. Tomasik's May 4, 2004 letter is attached hereto as

13    Exhibit "12".

14        25.    By May 12, 2004, when Mr. Umamoto had not responded, Mr. Tomasik

15    sent yet another letter which constituted his third request for offsets or reductions from

16    the policy limits, and also requested an update on the status of Mr. Umamoto's

17    investigation.  A true and correct copy of Mr. Tomasik's May 12, 2004 letter is attached

18    hereto as Exhibit "13".

19        26.    On May 18, 2004, Mr. Umamoto finally provided Mr. Tomasik with the

20    offsets that were being alleged by USAA, but he did not provide the requested update

21    regarding USAA's investigation.  A true and correct copy of Mr. Umamoto's May 18,

22    2004 letter is attached hereto as Exhibit "14".

23        27.    On May 20, 2004, Mr. Tomasik requested a status on Mr. Umamoto's

24    attempts to obtain the X-ray films, and requested a copy of Ms. Caldwell's policy with

25    USAA at the time of the collision.  A true and correct copy of Mr. Tomasik's May 20,

26    2004 letter is attached hereto as Exhibit "15".

27        28.    That same day, Mr. Umamoto responded with a letter to Mr. Tomasik

28    advising that "We are finalizing the gathering of the medical records and films for our

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

1    formal records review.  If you have your client's pre and post accident films, please

2    forward them to USAA as soon as possible.  Unfortunately, your verbal hearsay input

3    from your consulting radiologist does not help anyone. ...There is no need to discuss

4    factual, legal, causation and apportionment issues at this time."  Even though USAA

5    had already alleged, on April 16, 2004, that they had ordered "all left hip films from Dr.

6    Schurman, Stanford Hospital (Palo Alto), Stanford University Medical Center (San

7    Francisco), Alta Bates Medical Center (Oakland) Dr. Mitra" (see, Exhibit 8), they were

8    now, over a month later, asking Ms. Caldwell to provide them.  A true and correct copy

9    of Mr. Umamoto's May 20, 2004 letter is attached hereto as Exhibit "16".

10        29.    On June 4, 2004, Mr. Tomasik responded with a letter to Mr. Umamoto

11   requesting that he provide USAA's record review physician with the verbal opinion of

12   Ms. Caldwell's consulting radiologist.  Mr. Tomasik also served a CCP §998 Offer to

13   Compromise in the amount of $199,744.99.  A true and correct copy of Mr. Tomasik's

14   June 4, 2004 letter is attached hereto as Exhibit "17".

15        30.    Having again not received a response from Mr. Umamoto, Mr. Tomasik

16   sent him a follow up letter on June 21, 2004 requesting responses to his May 20, 2004

17   and June 4, 2004 letters, and again reiterated his request for a copy of Ms. Caldwell's

18   insurance policy.  A true and correct copy of Mr. Tomasik's June 21, 2004 letter is

19   attached hereto as Exhibit "18".

20        31.    On July 1, 2004, Mr. Umamoto finally responded with a copy of Ms.

21   Caldwell's policy.  Mr. Umamoto wrote "If you are able to get medical records quicker

22   than we can, I would think that it would be in your client's best interest to forward them

23   to me.  If you have any of your client's x-rays or MRI's [sic] in your possession please

24   forward them to USAA immediately so that we may pass them on to our formal records

25   reviewer.  We have received some films from Stanford Healthcare Radiology to date."

26   Thus, after 4 ½ months, USAA had only managed to obtain just a few of the relevant

27   radiological films.  Mr. Umamoto also wrote "You have stated to me that you have

28   verbal input from a consulting radiologist that supports you client's injury was caused or

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

COMPLAINT AND DEMAND FOR JURY TRIAL

1   aggravated by this accident. I am sorry that your verbal input is not something I can

2   pass on to the records review doctor. However, if your consulting radiologist is willing to

3   commit his opinion to paper, I would be more than happy to pass his opinion on to the

4   records review doctor. Surely, you cannot expect me to pass on your hearsay input." A

5   true and correct copy of Mr. Umamoto's July 1, 2004 letter is attached hereto as Exhibit

6   "19".

7       32.    Mr. Tomasik responded in a July 9, 2004 letter expressing his shock and

8   dismay at USAA's failure to obtain relevant X-rays nearly five months after receiving the

9   settlement package. Mr. Tomasik also pointed out that all relevant information should

10  be provided to USAA's records reviewer whether it is verbal or written, hearsay or not.

11  Mr. Tomasik also informed Mr. Umamoto that "Ms. Caldwell has been unable to work

12  since the collision until very recently, and even then she is only working part-time.

13  **USAA's protracted delay in evaluating Ms. Caldwell's claim is causing great deal**

14  **of financial distress, and given her injured state, much emotional anxiety.** If you

15  still do not have all of Ms. Caldwell's X-rays, I am more than willing to send you

16  whatever X-rays you need, **so please let me know at your earliest convenience**

17  **which X-rays you do not have yet.**" (Emphasis added.) A true and correct copy of Mr.

18  Tomasik's July 9, 2004 letter is attached hereto as Exhibit "20".

19      33.    Having, yet again, not received a response from Mr. Umamoto, Mr.

20  Tomasik faxed a letter to Kathy Brayer, who is the Claims Service Manager for USAA's

21  Sacramento office and Mr. Umamoto's supervisor, on July 23, 2004 at 9:26 a.m. Mr.

22  Tomasik informed her of some of Mr. Umamoto's delaying and other bad faith tactics,

23  and requested that she and her supervisors "review the claims file for this claim as soon

24  as possible, and provide me with a response to our settlement demand promptly." A

25  true and correct copy of Mr. Tomasik's July 23, 2004 letter to Ms. Brayer is attached

26  hereto as Exhibit "21". Additionally, Mr. Umamoto sent a letter on July 23, 2004 to Mr.

27  Tomasik stating "I understand that your client has recovered a [sic] $100,000 from her

28  third party claim. Can you be a little more specific how this loss is creating a financial

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT CA 91711 TEL 909 621 4935

COMPLAINT AND DEMAND FOR JURY TRIAL

1    hardship on her?" Mr. Umamoto also stated "I have routed your client's medical bills of

2    $48,206 to our Medical Payments Coverage unit to let them address what they need to

3    do or if they too will wait for the completion of the records review." A true and correct

4    copy of Mr. Umamoto's July 23, 2004 letter is attached hereto as Exhibit "22".

5         34.    On July 27, 2004, Mr. Umamoto wrote "The records reviewer has asked

6    for your client's films taken at Alta Bates Hospital, our copy service has indicated there

7    were no x-rays at that location available for your client." A true and correct copy of Mr.

8    Umamoto's July 27, 2004 letter is attached hereto as Exhibit "23". Following receipt of

9    Mr. Umamoto's letter, Mr. Tomasik called Alta Bates Radiology Department on July 28,

10   2004, and an employee, identifying himself as "Tommy", stated that he was able to

11   locate the records quickly and easily, and there was no basis for Mr. Umamoto's claim

12   that the X-rays were not available to be copied.

13        35.    Mr. Tomasik stated the facts set forth in Paragraph 34 above in his July

14   28, 2004 reply letter to Mr. Umamoto. Mr. Tomasik also wrote "I did not ask you to

15   submit the bills to your Med Pay unit, and in fact had specifically told both you and the

16   USAA Med Pay adjuster that Ms. Caldwell did not wish to use her Med Pay coverage at

17   this time." A true and correct copy of Mr. Tomasik's July 28, 2004 letter is attached

18   hereto as Exhibit "24".

19        36.    On August 2, 2004, Mr. Umamoto wrote responding to Mr. Tomasik's

20   letters of July 23rd and July 28th, stating "My manager Kathy Brayer has reviewed and

21   agrees with the following response. We are unable to accept or reject your demand for

22   policy limits at this time. The records reviewer has asked to review your client's x-rays

23   from Stanford Hospital which has [sic] been sent to him recently and from Alta Bates

24   Radiology which our copy service is getting on a rush basis. We apologize for the minor

25   delay on the confusion on which Alta Bates location had on your client's x-rays. Once

26   the above is completed we will be able to complete the evaluation of your client's claim."

27   By this point, it had been nearly six months since Mr. Tomasik submitted the settlement

28   package and four months since USAA alleged to have ordered the above-mentioned

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

COMPLAINT AND DEMAND FOR JURY TRIAL

1   films. A true and correct copy of Mr. Umamoto's August 2, 2004 letter is attached

2   hereto as Exhibit "25".

3       37.    On September 8, 2004, Mr. Umamoto faxed a letter stating "It took our

4   copy service a little longer than anticipated to get this film from this provider even on a

5   rush basis. We received one film taken on August 2, 2003 at Alta Bates Medical

6   Center." A true and correct copy of Mr. Umamoto's September 8, 2004 letter is

7   attached hereto as Exhibit "26".

8       38.    Mr. Tomasik responded with a September 8, 2004 letter stating "I called

9   the Alta Bates Radiology Department on August 11, 2004, and they informed me that

10  your copy service had picked up a copy of the film earlier that day. It is now almost one

11  month later, and I do not see any plausible reason why USAA still has not sent the film

12  to your records reviewer, especially in light of all of the other numerous delays by USAA

13  in this first party claim. ...As you know, USAA has a legal obligation to conduct it's [sic]

14  own prompt investigation to evaluate their insured's claim in good faith. Ms. Caldwell is

15  not required to incur the time and expense (and risk of loss) of sending you any films

16  that she paid to obtain, and especially those that USAA has already obtained.

17  Nonetheless, in the spirit of cooperation, if USAA has been unable to obtain any other

18  films that your records reviewer needs in order to complete his or her review, please

19  identify the specific films and the reason why you have been unable to obtain them, and

20  I will provide you with our copies of the films you are missing. Please also inform me

21  whether your records reviewer has all of the other information that he or she needs to

22  perform their review, and please provide me with a time estimate as to when you

23  anticipate responding to our settlement offer." A true and correct copy of Mr. Tomasik's

24  September 8, 2004 letter is attached hereto as Exhibit "27".

25      39.    Having not received a response to that letter, on September 23, 2004, Mr.

26  Tomasik sent a letter to Mr. Umamoto requesting a response and noting that more than

27  7 months had passed since the submission of the settlement package without a final

28  decision from USAA. A true and correct copy of Mr. Tomasik's September 23, 2004

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

- 13 -

1    letter is attached hereto as Exhibit "28".

2        40.    On September 27, 2004, Mr. Umamoto finally responded with a letter in

3    which he stated "According to our records reviewer he did want to see only Alta Bates

4    and Stanford Hospital films. He has seen Stanford's and has in his possession the Alta

5    Bates film. I have checked and understand his report is due around October 8, 2004. I

6    understand that the records reviewer asked for the above films only, so there will be no

7    need to disclose all the films you or your client possess at this time." A true and correct

8    copy of Mr. Umamoto's September 27, 2004 letter is attached hereto as Exhibit "29".

9        41.    On October 12, 2004, nearly 8 months from the initial claim date, Mr.

10    Umamoto sent a denial letter stating "This letter is to inform you of our position on your

11    client's Underinsured Motorist claim. Our records review is now completed. We agree

12    with the conclusion that the hip replacement was not related to this automobile accident.

13    Given the fact that your client received $100,000 for her bodily injury claim from the

14    tortfeasor's insurance. [sic] We believe she has been more than fully compensated for

15    her accident related injuries." A true and correct copy of Mr. Umamoto's October 12,

16    2004 letter is attached hereto as Exhibit "30".

17        42.    On October 12, 2004, Mr. Tomasik responded via facsimile stating "we

18    never claimed that the hip replacement was related to the subject motorvehicle collision.

19    Ms. Caldwell had a hip replacement in 1988, and had a hip replacement revision

20    surgery performed about 11 weeks before the subject collision. Obviously these

21    surgeries are not related to the subject collision, so your comment is non-sensical and

22    completely misses the point of this claim. We have claimed that it is more likely than

23    not that the collision was a substantial factor in causing Ms. Caldwell's left hip fracture

24    and the surgery to repair her left femur fracture. It is unbelievable that after nearly 8

25    months of evaluating this claim, USAA still does not even understand the basic injuries

26    involved. Please forward this claim to counsel immediately so we can proceed with

27    binding underinsured motorist arbitration." (Emphasis added.) A true and correct copy

28    of Mr. Tomasik's October 12, 2004 letter is attached hereto as Exhibit "31".

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT, CA 91711 TEL 909 621 4935

- 14 -

43.    In his October 13, 2004 letter, Mr. Umamoto wrote "This letter is in response to your letter dated October 12, 2004. You are correct, it was not about the hip replacement history, it was about the hip injury and the subsequent treatment that was caused by this accident. I apologize for any miscommunication on this issue. I will transfer this file for binding arbitration as you requested." After acknowledging his erroneous basis for denying Ms. Caldwell's claim, Mr. Umamoto never mentioned the actual basis for USAA's denial of the claim. It had already taken USAA nearly eight months to deny Ms. Caldwell's UIM claim, and they could not even provide a valid basis for their denial. A true and correct copy of Mr. Umamoto's October 13, 2004 letter is attached hereto as Exhibit "32".

44.    On October 27, 2004, Charlton R. Leasure, the Litigation Manager for USAA's Western Regional Office, wrote to Mr. Tomasik advising that he had taken over handling of the claim from Ray Umamoto, and that the file was being mailed that day to defense counsel, Barbara Schafer with the Law Office of Vince McLorg (the same law firm that handled the underlying third party claim for USAA). A true and correct copy of Mr. Leasure's October 27, 2004 letter is attached hereto as Exhibit "33".

45.    That same day, Mr. Tomasik sent a letter to Ms. Schafer noting the improper claims handling by Mr. Umamoto, and offering to settle for the policy limits. That letter also stated "If USAA is [sic] still refuses to tender the policy limits, we hereby request that they provide a detailed explanation of the facts, law and policy provisions supporting this decision as soon as possible as required by the California Fair Claims Settlement Practices Regulations. Given that more than eight months have passed since we submitted our demand package, and given that our office has already thoroughly investigated this claim, if USAA will not be tendering the policy limits, I request that you contact me regarding acceptable arbitrators and the earliest possible arbitration date." A true and correct copy of Mr. Tomasik's October 27, 2004 letter is attached hereto as Exhibit "34".

46.    On November 5, 2004, Ms. Schafer left a telephone voicemail message

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

- 15 -

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

1  for Mr. Tomasik stating that she was in the process of obtaining the underlying file and

2  reviewing the medical records.  Mr. Tomasik memorialized that message in a November

3  9, 2004 letter to Ms. Schafer, and also noted that "Ms. Caldwell is extremely distraught

4  that it not only took USAA (her own insurance company) nearly eight months to

5  evaluate her UIM claim, but after all of that time, the CSAA [sic] adjuster still could not

6  accurately characterize her injuries in the letter denying her claim."  A true and correct

7  copy of Mr. Tomasik's October 27, 2004 letter is attached hereto as Exhibit "35".

8      47.    In a telephone conversation with Mr. Tomasik on December 1, 2004, Ms.

9  Schafer stated that she would be sending X-ray films to radiologist William Hoddick for

10  review.

11     48.    On December 13, 2004 Ms. Schafer sent a letter to Mr. Tomasik stating "I

12  have sent your client's X-rays off for review.  In reviewing the file, I did not see

13  documentation as it pertains to Ms. Caldwell's loss of earnings from her job as Curator

14  at the Oakland Museum. ...  Could you please send me documentation to support her

15  wage claim including a pay stub and perhaps itemization of the time missed or any

16  other letters from employers etc. that you may have."  Additionally, Mr. Tomasik had

17  previously provided wage loss documentation to Mr. Umamoto.  It was apparent that

18  USAA was continuing to ignore Mr. Tomasik's request for a written explanation for its

19  denial of the claim and for the names of arbitrators acceptable to USAA.  A true and

20  correct copy of Ms. Shafer's December 13, 2004 letter is attached hereto as Exhibit

21  "36".  Mr. Tomasik forwarded another copy of wage loss documentation to Ms. Schafer

22  on December 20, 2004.

23     49.    On December 14, 2004, Mr. Tomasik sent a letter to Ms. Schafer

24  memorializing their December 1, 2004 telephone conversation stating "In our telephone

25  conversation of December 1, 2004, you stated that you would be sending Ms.

26  Caldwell's X-rays to radiologist William Hoddick for review.  You stated that if Dr.

27  Hoddick was able to observe the trachanter ring fracture...in Ms. Caldwell's left hip you

28  anticipated that USAA would then tender the $300,000 policy limits, minus the $100,000

COMPLAINT AND DEMAND FOR JURY TRIAL

1    set-off for the third party settlement. Given that we sent our settlement package to

2    USAA nearly _10 months_ ago, if you have not heard from Dr. Hoddick, Ms. Caldwell

3    would greatly appreciate it if you would follow up with him and request that he expedite

4    his review." A true and correct copy of Mr. Tomasik's December 14, 2004 letter is

5    attached hereto as Exhibit "37".

6         50.    Ms. Schafer responded in a December 15, 2004 letter (which was

7    received after December 20, 2004), stating that "I wanted to clarify a few things...During

8    our phone conversation, I indicated to you that I was reviewing all of your client's

9    numerous medical records and intended to send her X-rays to a Radiologist for

10   review...I never meant to indicate that if certain findings were confirmed...it would

11   automatically result in USAA tendering the policy limits....However, I did hear from Dr.

12   Hoddick and he has indicated that there were no initial films from Alameda Hospital

13   taken on the date of the loss...." Ms. Schafer also stated "I note from the records that

14   Ms. Caldwell has a history of alcoholism and depression. ... In her deposition Ms.

15   Caldwell testified that she was earning a $78,000 salary per year." Thus, it appears that

16   Ms. Shafer had obtained the underlying third party file from the attorney at her firm who

17   had handled that case. Ms. Schafer also provided the names of arbitrators that USAA

18   would be willing to use for the arbitration. Ms. Schafer also stated that she would be out

19   of the country and unavailable from December 24, 2004 through January 7, 2005. In

20   the meantime, Ms. Caldwell was left to endure the difficulties of her injuries and go

21   through the holidays nearly destitute with yet another delay in the resolution of her

22   claim. A true and correct copy of Ms. Schafer's December 15, 2004 letter is attached

23   hereto as Exhibit "38".

24        51.    On January 3, 2005, Mr. Tomasik responded, enclosing a signed

25   Authorization For The Release of Health Care Information (as requested by USAA on

26   December 15, 2004) and offering to allow his copies of X-rays be copied in order to

27   expedite resolution of the claim and suggesting that a retired Alameda County judge

28   such as Michael Ballachey or Richard Hodge serve as arbitrator. A true and correct

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

1   copy of Mr. Tomasik's January 3, 2005 letter is attached hereto as Exhibit "39".

2   Additionally, pursuant to Ms. Schafer's request, Mr. Tomasik obtained a letter from the

3   manager of the City of Oakland Museum which stated that Ms. Caldwell was only able

4   to work a total of 214 hours during the period of June 6, 2003 through March 31, 2004

5   (a period of approx. 9 months) and faxed it to Ms. Schafer on January 10, 2005.

6       52.     Having not heard from Ms. Schafer for over two weeks, Mr. Tomasik faxed

7   another letter on January 18, 2005 stating "please contact me at your earliest

8   convenience regarding my suggestions for arbitrators for this matter so we can proceed

9   to arbitration as quickly as possible." A true and correct copy of Mr. Tomasik's January

10  18, 2005 letter is attached hereto as Exhibit "40".

11      53.     Another nine days passed without a response, so Mr. Tomasik faxed yet

12  another letter regarding his suggestion for arbitrators on January 27, 2005 stating "If I

13  do not receive a response by February 2, 2005, I will be forced to file a motion to

14  compel arbitration and to select an arbitrator."

15      54.     On March 1, 2005, Mr. Tomasik wrote that he had sent his copies of X-

16  rays films to USAA's radiologist William Hoddick on February 22, 2005, but he had not

17  heard from Ms. Schafer since that time. He also stated that in addition to Judge

18  Ballachey or Judge Hodge, Ms. Caldwell was also willing to have either Judge Ken

19  Kawaichi or Demetrios Agretelis serve as the arbitrator. Ms. Schafer continued to

20  ignore all of these attempts to select an arbitrator, so on March 9, 2005 Mr. Tomasik

21  filed a Petition to Appoint an Arbitrator with the Alameda County Superior Court. A true

22  and correct copy of the Petition to Appoint and Arbitrator is attached hereto as Exhibit

23  "41".

24      55.     On March 10, 2005, Mr. Tomasik sent a letter referring to the Petition and

25  once again requesting a detailed written explanation of the law, facts and policy

26  provisions upon which the denial of the claim was based as required by the California

27  Fair Claims Settlement Practices Regulation 2695.7(a)(1). Finally, Vincent McLorg of

28  Ms. Schafer's office wrote to Mr. Tomasik on March 16, 2005 stating that USAA was

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

- 18 -

1    willing to have Michael Ballachey, Richard Hodge or Ken Kawaichi act as the arbitrator

2    in this matter. On March 29, 2005, Mr. Tomasik notified JAMS that Judge Michael

3    Ballachey had been agreed to by both parties.

4        56.    On June 30, 2005, Mr. Tomasik wrote to Ms. Schafer requesting that the

5    arbitration hearing be set for the week of August 15-19 or August 22-26, 2005. Having

6    not received a response from Ms. Schafer, Mr. Tomasik again wrote to her on July 7,

7    2005 requesting available dates for the arbitration hearing. Ms. Schafer finally

8    responded with a telephone call and the arbitration of the matter was set for August 30,

9    2005.

10       57.    Additionally, even though the claim file was sent to defense counsel on

11   October 27, 2004, the defense medical examination was not performed until July 11,

12   2005, an additional delay of nearly nine months. On July 12, 2005, a defense medical

13   examination was performed on Ms. Caldwell by Terrence McDonnell, M.D.. Even

14   though Mr. Tomasik had requested someone neutral and unbiased, USAA nonetheless

15   selected a doctor who has a reputation as an extremely biased "hired gun" on behalf of

16   insurance companies. Despite overwhelming evidence in the medical records that pain

17   from the collision caused Ms. Caldwell's left leg to give out, which caused her to fall on

18   two occasions around the time her femur fracture was discovered in August, 2003, Dr.

19   McDonnell contended in his report (see, Exhibit "2") that the collision was not a factor in

20   causing the falls. In his DME report dated July 11, 2005, curiously dated one day

21   *before* the exam, Dr. McDonnell states on page 9 "There are x-rays of the hip from

22   Alameda Hospital dated June 6, 2003. ... There is also an arrow indicating a possible

23   pubic ramus fracture." (See Exhibit 2.) On page 29, Dr. McDonnell states "The

24   changing of rotation in the femoral component with rotation is somewhat unusual.

25   However, the records by Dr. Schurman indicate that she had decent orientation of

26   rotation prior to the motor vehicle accident." On page 30, Dr. McDonnell states "In

27   summary, I think that this woman did sustain a rotation of the femoral component from

28   the motor vehicle accident in question. It has altered her gait somewhat but not

- 19 -

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

1   excessively.  The limp that she has in [sic] associated with a longstanding hip problem

2   with multiple operations that have left her hip weakened."  On page 31, Dr. McDonnell

3   states "The striking part of the examination was really the internal rotational differences

4   in the total hip replacement as noted. ...Regarding the medical treatment from the motor

5   vehicle accident in question, I think her treatment seemed to be appropriate for the hip.

6   The patient certainly could live with the amount of internal rotation deformity she has of

7   the hip following the motor vehicle accident."

8          58.     Despite the fact that its own doctor concluded that the rotation of the hip

9   prosthesis was caused by the subject collision, USAA continued to refuse to offer

10  anything for the UIM claim.

11         59.     On July 12, 2005, Mr. Tomasik wrote to Ms. Schafer stating "A nurse

12  observer and I attended Dr. McDonnell's examination of Ms. Caldwell, and he conceded

13  that Ms. Caldwell does not have normal external rotation of her left leg, and stated that

14  her on-going problems in her left hip has caused a loss of strength and balance on her

15  left leg that does not exist on her right leg.  Given that it is not practical to attempt to

16  realign Ms. Caldwell's prosthesis, this is a very significant deformity that will hamper Ms.

17  Caldwell on a daily basis for the rest of her life."  Mr. Tomasik went on to write "Ms.

18  Caldwell has gradually developed significant neck and shoulder pain as a result of using

19  her cane...I have learned that Ms. Caldwell developed Reflex Sympathetic Dystrophy

20  (Complex regional Pain Syndrome) as a result of the collision, and I have enclosed the

21  medical records of Nicole Barry, M.D. which indicate this.  As you probably know RSD

22  (CRPS) is a horrible nerve dysfunction which is extremely painful and disabling....At Dr.

23  McDonnell's exam, we observed classic symptoms of RSD...."  Mr. Tomasik further

24  advised Ms. Schafer that "Ms. Caldwell is willing to leave her policy limits offer...open

25  until July 19, 2005."  A true and correct copy of Mr. Tomasik's July 12, 2005 letter is

26  attached hereto as Exhibit "42".

27         60.     In her July 19, 2005 reply to Mr. Tomasik, Ms. Schafer acknowledged

28  receipt of additional medical records with a new diagnosis and Ms. Caldwell's demand

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 9711  TEL 909 621 4935

1  for the remaining $200,000 of the policy limits and advised that the "new information

2  needs to be reviewed by both USAA and Dr. McDonnell. Additionally, I will need Dr.

3  McDonnell's IME report back and an opportunity to review it with USAA prior to being

4  able to respond to your policy demand." A true and correct copy of Ms. Schafer's July

5  19, 2005 letter is attached hereto as Exhibit "43".

6      61.    On August 3, 2005 Mr. Tomasik responded to Ms. Schafer's July 19th

7  letter stating "While I did agree to be reasonable regarding any requests for a

8  continuance of the arbitration based on the discovery of Ms. Caldwell's RSD, this offer

9  is contingent upon USAA making a good faith effort to expedite their evaluation of this 1

10  ½ year old claim." A true and correct copy of Mr. Tomasik's August 3, 2005 letter is

11  attached hereto as Exhibit "44".

12     62.    On August 12, 2005, Mr. Tomasik sent a letter to Ms. Schafer stating that

13  he believed that Ms. Caldwell's previous medical problems (brain tumor, Reynaud's

14  Syndrome, Sjogren's Disease, etc.) and alleged alcohol use were not relevant nor

15  admissible at arbitration, and "I request that you do not mention them or introduce any

16  evidence regarding them until after I file a motion *in limine* with the arbitrator. ... In

17  addition, while I will allow you to introduce evidence of the $100,000 settlement with

18  USAA in the underlying claim, the UIM policy limits are irrelevant to the arbitrator's

19  determination of the relevant issues in this case (liability, causation and damages), and

20  thus such policy limits are inadmissible. Thus, I request that you refrain from

21  mentioning the policy limits to the arbitrator until after he has ruled on my motion in

22  limine to exclude mention of them." A true and correct copy of Mr. Tomasik's August

23  12, 2005 letter is attached hereto as Exhibit "45".

24     63.    On August 17, 2005, Charlton Leasure, the USAA Regional Claims

25  Manager, telephoned Mr. Tomasik requesting a copy of Mr. Tomasik's August 3, 2005

26  letter to Ms. Schafer. On August 18, 2005, Mr. Leasure sent a letter to Mr. Tomasik

27  stating that USAA was offering $50,000 new money to settle the claim. A true and

28  correct copy of Mr. Leasure's August 18, 2005 letter is attached hereto as Exhibit "46".

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

64. On August 15, 2005, JAMS case administrator Cindy Cravalho telephoned Mr. Tomasik stating that she would have to reschedule the arbitration hearing because Ms. Schafer was not returning her telephone calls regarding the arbitration. The arbitration was then rescheduled for September 28, 2005 (more than 1 year and 7 months from the date Ms. Caldwell initially submitted her claim).

65. In the meantime, on September 22, 2005, more than a year after Ms. Caldwell served the CCP §998 offer, Ms. Schafer sent a letter to Mr. Tomasik advising that it was USAA's position that the June 4, 2004 CCP §998 Offer to Compromise "was premature and therefore null and void."

66. Furthermore, as the arbitration quickly approached, even though Mr. Tomasik and Ms. Schafer had previously agreed to exchange briefs by September 23, 2005, Ms. Schafer waited until September 22, 2005 to request that the date for exchange be put out to September 26, 2005. Despite Mr. Tomasik's letter of September 22, 2005 objecting to the later date, Ms. Schafer did not fax USAA's brief to Mr. Tomasik until September 27, 2005, the day before the hearing. A true and correct copy of Mr. Tomasik's September 22, 2005 letter is attached hereto as Exhibit "47".

67. To Mr. Tomasik's dismay, he noted that on the first page of USAA's brief, Ms. Schafer deliberately disclosed the UIM policy limits of $300,000 despite Mr. Tomasik's written request (see, Exhibit "45") that she not do so. Additionally, USAA committed evidentiary misconduct by failing to notify Mr. Tomasik of its intent to do so. At the arbitration hearing, Mr. Tomasik vehemently objected to Ms. Schafer's disclosure of the policy limits, and Ms. Schafer had no explanation whatsoever as to why she disclosed those limits after receiving Mr. Tomasik's written request that USAA not do so.

68. Moreover, defense doctor Terrence McDonnell, M.D. testified at the arbitration that he completely changed his opinion regarding the shifting of the prosthesis in Ms. Caldwell's left hip. He claimed that he was "fuzzy-headed" after writing a 32-page report, and that his conclusion was simply wrong. Unbelievably, he went even further, stating that not only was his ultimate conclusion wrong, but it was

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

1   "impossible." The arbitration was not able to be completed on September 28, 2005, so

2   closing argument was scheduled for October 7, 2005.

3          69.    In the meantime, Mr. Tomasik made a motion to reopen the case-in-chief

4   based upon newly discovered evidence, so the closing argument had to be

5   rescheduled. Instead of allowing all relevant evidence to be heard so that its insured

6   could have her claim decided on the merits, USAA unsuccessfully opposed the motion

7   to re-open the case-in-chief.

8          70.    Furthermore, despite noticing the deposition of Ms. Caldwell's radiologist

9   regarding this newly discovered evidence, USAA's counsel did not bring payment to the

10  deposition, but promised to send him a check immediately after his deposition. USAA's

11  counsel then failed to send a check, and Mr. Tomasik had to send a follow-up letter

12  requesting payment.

13         71.    Undaunted, Mr. Tomasik continued to try and settle the matter for the

14  policy limits with USAA. One example of this is Mr. Tomasik's letter of September 30,

15  2005 to Ms. Schafer. Mr. Tomasik pointed out the differences in Dr. McDonnell's

16  original report and his testimony during the arbitration session held on September 28,

17  2005 by stating "Not only did Dr. McDonnell find significant shifting of the hip prosthesis,

18  he called it a 'deformity,' and concluded that it was caused by the subject collision.

19  Nonetheless, USAA still refused to offer the remaining policy limits. Then Dr.

20  McDonnell testified *under oath* at the arbitration this Wednesday that he has completely

21  changed his opinion…that he suddenly believes that collision did <u>not</u> cause the

22  misalignment…that it would have been 'impossible' for the collision to have caused the

23  misalignment. When asked when he changed his opinion, he said it was at the

24  arbitration hearing on September 29, 2005. He also testified that this was not based on

25  any new information or speaking with you or anyone else, but only because he 'thought

26  about it some more.'" A true and correct copy of Mr. Tomasik's September 30, 2005

27  letter is attached hereto as Exhibit "48".

28         72.    Mr. Tomasik requested that closing argument to be rescheduled in mid-

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

1  December so that Ms. Caldwell did not have to spend another holiday season financially

2  destitute. Unfortunately, Ms. Schafer was busy playing polo in South America, so

3  closing arguments were not completed until December 24, 2005, nearly two years after

4  the UIM claim began.

5      73.    Finally, on January 6, 2006, Judge Ballachey issued a seven-page

6  arbitration award in which he awarded Ms. Caldwell a total of **$355,110.97**. This award

7  exceeded the underlying third party limits by $255,110.97, which is more than five times

8  the amount offered by USAA shortly before the arbitration.

9      74.    After receiving the award, Mr. Tomasik sent a fax to Ms. Schafer on

10  January 6, 2006 requesting that USAA pay the remaining $200,000 UIM policy limits,

11  and also mentioned that costs and interests were recoverable from USAA since the

12  arbitration award exceeded the amount of Ms. Caldwell's CCP §998 Offer to

13  Compromise.

14      75.    On January 10, 2006, Ms. Schafer telephoned Mr. Tomasik and stated

15  that USAA was offering to pay the $200,000 in UIM limits and the remaining $49,745 in

16  Med Pay limits, as long as Ms. Caldwell was willing to sign a release. Even though this

17  UIM claim involved a binding award rather than a settlement, Mr. Tomasik saw no harm

18  in agreeing to a release, but stated that it must be limited to the issues litigated in the

19  arbitration. Ms. Schafer also agreed that pursuant to the CCP §998 Offer to

20  Compromise, USAA would be paying statutory interest and reasonable litigation costs.

21      76.    However, Ms. Schafer sent a release to Mr. Tomasik which included bad

22  faith claims. Mr. Tomasik then revised the release to conform with counsel's verbal

23  agreement limiting the release to benefits under the policy, and excluding any extra-

24  contractual claims or bad faith claims, and sent the revised release to Ms. Schafer on

25  January 12, 2006.

26      77.    Ms. Schafer telephoned Mr. Tomasik on the morning of January 13, 2006

27  and asked Mr. Tomasik to change the reference to "claims arbitrated before Judge

28  Ballachey" to "claims for benefits under the policy," and Mr. Tomasik agreed to this

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

1    revision.  Ms. Schafer then asked Mr. Tomasik what he meant by the phrase "extra-

2    contractual claims" which was inserted by Mr. Tomasik in his proposed revised release.

3    Mr. Tomasik explained that it included claims related to claims handling such as bad

4    faith claims, and Ms. Schafer responded that she thought USAA would be obtaining a

5    release of those types of claims by offering the remaining $49,745 of the Med Pay

6    limits.  Mr. Tomasik responded that Ms. Caldwell was not willing to do that, and that if

7    Ms. Caldwell was going to sign a release, language had to be inserted that excluded

8    bad faith claims from the release.  Mr. Tomasik also pointed out that USAA was not

9    even allowed to seek a release of those claims when resolving the claims under the

10   insurance contract.  Ms. Schafer stated that she would research the issue and get back

11   to Mr. Tomasik.

12        78.    Later in the day on January 13, 2006, Mr. Tomasik faxed a revised version

13   of the release that excluded bad faith claims.  At 2:42 p.m., Ms. Schafer faxed a release

14   to Mr. Tomasik which again did not exclude bad faith claims.

15        79.    Mr. Tomasik responded with a fax letter on January 16, 2006 which stated

16   "You initially stated that you wanted the Release so that USAA could avoid any future

17   property damage or other claims under the USAA policy, but now you are attempting to

18   include bad faith claims in the Release.  Ms. Caldwell does not have to, and will not,

19   agree to that in order to be paid what she is rightfully owed from the arbitration award.

20   Given that Ms. Caldwell has a binding arbitration award, USAA is not entitled to demand

21   a release of any kind, and is only entitled to a satisfaction of judgment after they have

22   satisfied the award."

23        80.    Ms. Schafer responded with a January 18, 2006 letter claiming "I in no

24   way intended to try to get Mrs. Caldwell [sic] sign away her right to pursue further action

25   against USAA if she felt compelled under theories of bad faith."  Ms. Schafer also stated

26   in that letter "In addition to reasonable costs associated with the litigation, USAA is

27   compensating Ms. Caldwell in the amount of 10% interest since the date of the 998 in

28   June 2004.  That interest will be paid in a separate check which includes the costs you

COMPLAINT AND DEMAND FOR JURY TRIAL

1  just submitted.  USAA will overnight the draft to you under separate cover for the costs

2  and interests.  They are reviewing the cost bill currently."   Despite that explicit written

3  agreement to pay statutory interest and costs, USAA then abruptly changed its mind

4  and stated in a January 23, 2006 letter to Mr. Tomasik that it would not pay costs and

5  interest.

6        81.    On February 7, 2006 Ms. Caldwell filed and personally served a

7  Memorandum of Costs on USAA.  On February 22, 2006, USAA filed a motion to strike

8  costs alleging that Ms. Caldwell's CCP §998 offer to compromise was invalid because

9  at the time the offer was sent, USAA was not a "party" to a lawsuit – that there was no

10 "action" pending and they were not represented by counsel.

11       82.    On March 28, 2006 the Court denied USAA's motion stating, "The

12 evidence submitted establishes that USAA agreed to pay the subject costs and interest,

13 based upon its assumption that the June 2004 Offer of Compromise, served on USAA's

14 claims examiner, was a valid offer...Having agreed to pay the costs and interest, USAA

15 is precluded from challenging the validity of the offer now."

16       83.    On April 17, 2006 USAA filed a Petition to Correct or Vacate Arbitration

17 Award arguing that Ms. Caldwell was only entitled to her UIM policy limits of $200,000

18 because USAA is only liable to the insured for the *difference* between the insured's

19 policy limits and the amount paid to the insured by the person responsible for the

20 injuries sustained or that party's insurer.

21       84.    On June 6, 2006, the Court granted USAA's motion stating that the

22 arbitrator's award in favor of Ms. Caldwell and against USAA was in an amount that

23 exceeded the policy limits, and exceeded the arbitrator's authority.  The Court corrected

24 the arbitrator's award to clarify that Ms. Caldwell was awarded a total sum of $249,775

25 as economic and non-economic damages.  A judgment was entered on August 15,

26 2006 to reflect same.

27       85.    On October 4, 2006 USAA filed an appeal from the Judgment entered on

28 August 15, 2006 and all interlocutory orders and rulings, including the Order allowing

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 9771  TEL 909 621 4935

COMPLAINT AND DEMAND FOR JURY TRIAL

1    Ms. Caldwell to recover costs and prejudgment interest. On February 7, 2007 counsel

2    stipulated to dismiss the appeal.

3         86.    Finally, just a mere twelve days away from 3 years since Ms. Caldwell

4    submitted her claim, the matter was settled for $200,000 on the underinsured motorist

5    claim and $49,775.00 on the medical claim.

6

7                           **FIRST CAUSE OF ACTION**

8              **(Breach of the Duty of Good Faith and Fair Dealing)**

9         **PLAINTIFF, CAREY T. CALDWELL, FOR A FIRST CAUSE OF ACTION**

10   **AGAINST DEFENDANT USAA, AND DOES 1 THROUGH 100, INCLUSIVE, FOR**

11   **BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING, ALLEGES:**

12        87.    Plaintiff refers to each and every paragraph of the General Allegations and

13   incorporates those paragraphs as though set forth in full in this cause of action.

14        88.    Defendants, USAA, and DOES 1 through 100, inclusive, and each of

15   them, have breached their duty of good faith and fair dealing owed to plaintiff, in the

16   following respects:

17        a.    Unreasonably failing to pay policy benefits to plaintiff at a time

18   when defendants knew that plaintiff was entitled to the payments of these

19   benefits under the terms of the POLICY.

20        b.    Unreasonably withholding payments of policy benefits from plaintiff,

21   knowing plaintiff's claim for benefits under the POLICY were valid.

22        c.    Unreasonably failing to pay plaintiff policy benefits at a time when

23   defendants had no reasonable basis to justify such action.

24        d.    Unreasonably misrepresenting to plaintiff pertinent facts in relation

25   to the POLICY coverage in issue.

26        e.    Unreasonably failing to conduct a fair, thorough and balanced

27   investigation and to fairly process plaintiff's claim for uninsured motorists' benefits

28   under the POLICY.

- 27 -

f.    Unreasonably failing to attempt to effectuate a prompt, fair, and equitable settlement of plaintiff's claim for benefits for which liability had become reasonably clear.

g.    Unreasonably failing to promptly provide an explanation of the basis relied upon in the POLICY, in relation to the applicable facts, for the denial of plaintiff's claim for benefits in that defendants had ample medical evidence of the severity of Ms. Caldwell's injuries and the residual impairments which resulted from those injuries, which justified payment of the benefits under the POLICY.

h.    Unreasonably compelling plaintiff to institute arbitration to recover amounts due under the POLICY by delaying, avoiding, and stalling any and all settlement negotiations.

i.    Unreasonably employing improper litigation tactics to further delay payment of the benefits under the POLICY by, including but not limited to:

(1)    Unilaterally delaying service of USAA's arbitration brief to claimant's counsel until the day before the hearing;

(2)    intentionally and improperly disclosing the underinsured motorist policy limits to the arbitrator despite claimant's counsel requesting the opportunity to first make a motion in limine to exclude;

(3)    by failing to notify claimant's counsel of the complete reversal of USAA's medical expert's opinion until the arbitration hearing;

(4)    opposing without merit claimant counsel's motion to reopen the case in chief; AND

(5)    forcing claimant's counsel to file a Petition to Compel Selection of Arbitrator in order to have an arbitrator selected; and

j.    Unreasonably failing to retain independent experts to provide fair and unbiased advice and opinions.

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

- 28 -

89.    Plaintiff is informed and believes and thereon alleges that defendants have breached their duty of good faith and fair dealing owed to plaintiff by other acts or omissions of which plaintiff is presently unaware and which will be shown according to proof at the time of trial.

90.    As a proximate result of the aforementioned unreasonable conduct of defendants, plaintiff has suffered, and will continue to suffer in the future, damages under the POLICY, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

91.    As a further proximate result of the aforementioned wrongful conduct of defendants, plaintiff has suffered anxiety, worry, mental, and emotional distress, all to plaintiff's general damage in a sum to be determined at the time of trial.

92.    As a further proximate result of the unreasonable and bad faith conduct of defendants, plaintiff was required to continue to retain legal counsel to obtain the benefits due under the POLICY. Therefore, defendants are liable to plaintiff for those attorneys' fees reasonably necessary and incurred by plaintiff in order to obtain the POLICY benefits in a sum to be determined at trial.

93.    Defendants' conduct described herein was intended by the defendants to cause injury to plaintiff or was despicable conduct carried on by the defendants with a willful and conscious disregard of the rights of plaintiff, or subjected plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights, or was an intentional misrepresentation, deceit, or concealment of a material fact known to the defendants with the intention to deprive plaintiff of property, legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code section 3294, thereby entitling plaintiff to punitive damages in an amount appropriate to punish or set an example of defendants.

94.    Defendants' conduct described herein was undertaken by the corporate defendants' officers or managing agents, identified herein as DOES 1 through 100, inclusive, who were responsible for claims supervision and operations, underwriting,

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 9711  TEL 909 621 4935

1  communications and/or decisions.  The aforedescribed conduct of said managing

2  agents and individuals was therefore undertaken on behalf of the corporate defendants.

3  Said corporate defendants further had advance knowledge of the actions and conduct

4  of said individuals whose actions and conduct were ratified, authorized, and approved

5  by managing agents whose precise identities are unknown to plaintiff at this time and

6  are therefore identified and designated herein as DOES 1 through 100, inclusive.

7

8  **SECOND CAUSE OF ACTION**

9  **(Breach of Contract)**

10  **PLAINTIFF, CAREY T. CALDWELL, FOR A SECOND CAUSE OF ACTION**

11  **AGAINST DEFENDANTS USAA CASUALTY INSURANCE COMPANY, AND DOES 1**

12  **THROUGH 100, INCLUSIVE, FOR BREACH OF CONTRACT:**

13      95.    Plaintiff refers to each and every paragraph of the General Allegations and

14  incorporates those paragraphs as though set forth in full in this cause of action.

15      96.    Defendants, and each of them, owed special duties and obligations to

16  plaintiff, Ms. Caldwell, under the POLICY.

17      97.    Defendants, and each of them, breached terms and provisions of the

18  insurance POLICY by failing and refusing to pay benefits under the POLICY as set forth

19  in the First Cause of Action, incorporated herein by reference.

20      98.    As a direct and proximate result of defendants' conduct and breach of its

21  contractual obligations, plaintiff has suffered damages under the POLICY in an amount

22  to be determined according to proof at the time of trial.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD CLAREMONT CA 91711 TEL 909 621 4935

1    WHEREFORE, plaintiff prays for judgment against defendants, and each of

2    them, as follows:

3

4    **AS TO THE FIRST CAUSE OF ACTION AGAINST DEFENDANTS USAA**

5    **CASUALTY INSURANCE COMPANY, AND DOES 1 THROUGH 100, INCLUSIVE,**

6    **FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING:**

7         1.    Damages for failure to provide benefits under the POLICY, plus interest,

8    including prejudgment interest, and other economic and consequential damages, in a

9    sum to be determined at the time of trial;

10        2.    General damages for mental and emotional distress in a sum to be

11    determined at the time of trial;

12        3.    For attorneys' fees incurred by plaintiff to obtain POLICY benefits in an

13    amount to be determined at trial;

14        4.    Punitive and exemplary damages in an amount appropriate to punish or

15    set an example of defendants;

16        5.    For costs of suit incurred herein; and

17        6.    For such other and proper relief as the Court deems just and proper.

18    / / /

19    / / /

20    / / /

21    / / /

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD. CLAREMONT CA 91711 TEL 909 621 4935

1       **AS TO THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS USAA**

2 **CASUALTY INSURANCE COMPANY, AND DOES 1 THROUGH 100, INCLUSIVE,**

3 **FOR BREACH OF CONTRACT:**

4     1.    Damages under the POLICY in an amount to be determined according to

5 proof at the time of trial.

6     2.    For costs of suit incurred herein; and

7     3.    For such other and further relief as the Court deems just and proper.

8

9 Dated:    May 18, 2007      SHERNOFF, BIDART & DARRAS, LLP

10

11

12         By _____

13              MICHAEL J. BIDART

             RICARDO ECHEVERRIA

14              Attorneys for Plaintiffs

15              **DEMAND FOR JURY TRIAL**

16

17     Plaintiff hereby demands a trial by jury.

18

19

20 Dated:    May 18, 2007      SHERNOFF, BIDART & DARRAS, LLP

21

22         By _____

23              MICHAEL J. BIDART

             RICARDO ECHEVERRIA

24              Attorneys for Plaintiffs

25

26

27

28

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS
600 S INDIAN HILL BLVD  CLAREMONT CA 91711  TEL 909 621 4935

# EXHIBIT 1